THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BERNARD M. JONES, Defendant-Appellant.

Fourth District No. 4—88—0039

Opinion filed September 22, 1988.

Gregory A. Mattingley, of Brown, Hawkins, Basola & Mattingley, of Decatur, for appellant.

Jeffrey K. Davison, State's Attorney, of Decatur (Kenneth R. Boyle, Robert J. Biderman, and J. A. C. Knuppel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

After a jury trial, defendant was convicted of one count of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(b)(1)), a Class X felony. The trial court sentenced defendant to a term of eight years' imprisonment. Defendant appeals from the judgment of the circuit court of Macon County, arguing (1) the jury's verdicts, finding him guilty of aggravated criminal sexual assault based on count I and acquitting him of the offense of aggravated criminal sexual assault as stated in count II, were logically inconsistent and he was not proved guilty beyond a reasonable doubt; and (2) the trial court committed reversible error in sustaining an objection to defendant's cross-examination of the examining physician on rape trauma syndrome. We affirm.

The information charged defendant with the offense of aggravated criminal sexual assault, committed on or about July 4, 1987, through August 20, 1987. Count I alleged defendant committed an act of sexual penetration of the victim by use of his finger; count II charged defendant with committing an act of sexual penetration upon the victim by the use of the tongue. The jury trial was conducted on December 16 and 17, 1987.

Defendant was 54 years old and the complaining witness was eight years old. Defendant was a friend of complaining witness' fam-

ily and had done some baby-sitting for the family in December 1986. During the summer of 1987, defendant would take the complaining witness or one of her two sisters, one at a time, swimming or fishing. During these visits, defendant would pick the child up by car from her home in the morning, take her swimming or fishing, and then to his house for lunch before returning her to her home. Defendant generally brought the child home at about 1 in the afternoon.

Defendant took each child to swim at a residence in Warrensburg, Illinois, and took them fishing at various locations. The victim's mother testified her eight-year-old daughter started going to defendant's house about the beginning of July 1987, and the last day the girl went to defendant's house was August 20, 1987. According to the victim's mother, defendant brought the eight-year-old home about 3:30 or 4 p.m. on August 20.

At trial, the complaining witness testified she first went to defendant's house after he took her fishing, after school let out for the summer. She said defendant also took her swimming. She did not know how many times she went swimming or fishing. When he took her swimming it would be for about half an hour, and then he would say they had to leave. She said defendant would then take her to his house for lunch. She named the man who resided with defendant and said he was home once when she arrived with defendant, but left after about a minute. The eight-year-old testified that after lunch, defendant would take her into his bedroom, at which time no one else was home. The child was questioned as follows about what would happen in the bedroom:

"Q. [PROSECUTOR]: What would happen in the bedroom?
A. [COMPLAINING WITNESS]: He would do it—do that.
Q. Do what?
A. Touch me down at my privates.
Q. Your privates?
A. Yes.
Q. What would he do to you?
A. He would lick me and put his finger up there.
Q. Now, did you want him to do this?
A. No.
Q. How many times did he do this?
A. About four."

The prosecutor had the child look at a diagram of a girl and then asked her, "What I would like you to do is just draw where [defendant] touched you. Can you do that for us?" Asked what the area she circled was called, the child answered, "private parts." The victim

testified defendant would pull down her sweat pants and, when he was done, pull her pants back up. She said defendant would then tell her, "Don't tell your mom."

The complaining witness did tell her mother on the night of August 24, 1987. Asked how she felt when she told her mother, she said she was scared because defendant said " 'not to tell your mom.' " The complaining witness acknowledged that on August 20, defendant had questioned her about two neighborhood boys and whether she let them touch her private parts or whether she touched their private parts, and told her he was going to tell her mother what he found out once he asked some further questions. She denied telling defendant she had allowed the boys to touch her private parts or that she had touched them.

The victim's mother testified that on the night of August 24, 1987, she was sitting downstairs watching television and the eight-year-old was lying on the couch waiting for her father to come home. The mother said she heard her two other daughters using some language in their bedroom which she had not heard them use before. She called them in and told them they had five minutes to tell her where they learned these words or she would use her bar of Ivory soap. She said the following then happened:

"[The complaining witness] jumped up off the couch, put her hands like this, and said 'Mommy, I'm scared.' And I said, 'of what.' I said 'because you didn't say anything.' She said 'No, mommy, you know how you are supposed to tell, you know you told me to tell if ever I had been touched somewhere I shouldn't be.' And I said, 'yes, I do.' And she said, 'well, mommy, I was.' "

She testified the complaining witness then told her where she had been touched and she called the police.

Officer Campbell arrived and talked to the victim's mother. Officer Campbell testified he spoke to the complaining witness on the evening of August 24 and she informed him she had been touched in her "private parts," so Campbell took the victim and her mother to Decatur Memorial Hospital, where they remained from about 11 p.m. to 2:30 a.m. for the child's examination.

Dr. Semones testified he examined the complaining witness at the hospital in the early morning hours of August 25, 1987. He said the child gave him history that a family friend, who had on occasion taken her swimming, had used his finger to fondle her in the vaginal area, and he had also kissed her in the genital area. He testified the child's hymen was present, but was rather loose and not totally intact as is

sometimes seen in children. Based on the history obtained and the physical examination, Dr. Semones said in his opinion some sort of sexual contact had occurred. He based his opinion on the detailed reporting the child gave of what happened and the fact she did not change her story while he talked to her about it.

Douglas Raver, a juvenile officer with the Decatur police department, testified he spoke to the complaining witness on the morning of August 27, 1987, and in this conversation the complaining witness indicated she had been sexually molested, "that somebody had inserted their finger in her vagina and also licked her on the vagina."

Dr. Jamie Warnick, a pediatrician, testified she performed a physical examination on the complaining witness on November 10, 1987. She found no physical symptoms of sex abuse, but said based on the history she received she would not have expected to. She said as the incident was related to her, it involved a fondling and also an "oral type intercourse." As a result of the examination, Warnick formed the opinion the child had been sexually abused.

Respondent took the stand in his own defense and denied committing the offenses upon the complaining witness. He said the child had been in his bedroom once, when he let her pick a doll from among some toys the prior inhabitants of the house had left behind. According to defendant, he took the complaining witness home on August 20, 1987, by 1 or 1:30 p.m.

Defendant named three girls, other than the complaining witness and her two sisters, he took swimming and fishing in the summer of 1987. He said his housemate, Mr. Burris, was working during July, but was laid off and at home on all of the days in August when he had any child at the house for lunch, including August 20. He said his housemate had a guest, Mr. Luster, at the house on August 20 when defendant arrived with the complaining witness. Defendant said he made the girl lunch and left to take her home while Burris and Luster were still at the house.

Defendant testified that as he drove the complaining witness home on August 20, he questioned her about two boys from her neighborhood, ages 10 and 12 or 14, and asked her whether either boy had touched her, pointing to the area between her legs. Defendant testified the complaining witness said the boys had touched her there. Defendant said he asked the child if she had touched them, pointing, and the complaining witness admitted to him she had, saying " 'we played with each other.' " Defendant said he told the complaining witness that after he found out everything about the touching incidents, he was going to tell her mother and father. Defendant

acknowledged he did not go to the parents of the complaining witness first regarding the alleged touching incidents he had uncovered.

The owner of the swimming pool testified defendant brought the complaining witness to swim twice in the summer of 1987. She said she would not let him bring more than one child at a time because she thought it would be difficult to take care of more than one around the pool. She testified defendant had a "bad leg" and said she never left the pool area when a child was there with defendant.

Burris testified defendant told him the night before whenever he, defendant, was planning to take a child somewhere the following day. Burris said he moved in with defendant about July 6, was laid off at the end of July, and was home in August at any time when defendant planned to bring a child home for lunch. Burris said on August 20, he and Luster were at the house when defendant brought the complaining witness home for lunch. He was able to hear defendant and the complaining witness in the kitchen the entire time they were at the house, and defendant left with the girl around 12:30 or 12:45 p.m. Burris said he and Luster stayed for at least half an hour and then went into town.

Burris testified defendant brought the complaining witness to the house for lunch twice and, although he was there on both occasions, defendant did not take the complaining witness into the bedroom area and no unusual behavior occurred between the defendant and the complaining witness. Burris acknowledged that while he was working in July, there were times when he came home after 1:30 in the afternoon and found the defendant and the complaining witness in the house by themselves. He further acknowledged there were five to seven days in August when he was not present at the house during the noon hour, and said he was not in the house between 1 and 3:30 p.m. on August 20.

Luster testified he was at defendant's house with Burris on August 20 when defendant arrived with the complaining witness. Luster said that from his vantage point in the living room, he could see defendant and the complaining witness at all times, they never left the kitchen, and defendant left the house with the complaining witness after they finished lunch. He said he and Burris stayed at the house about half an hour before leaving.

Upon this evidence, the jury returned a verdict of guilty on the count of aggravated criminal sexual abuse involving penetration with a finger, and a verdict of not guilty on the count charging penetration by use of the tongue.

Defendant concedes the verdicts are not legally inconsistent, but

maintains the verdicts are so logically inconsistent as to raise a reasonable doubt of his guilt. In *People v. Murray* (1975), 34 Ill. App. 3d 521, 531-32, 340 N.E.2d 186, 194, the court stated:

"Verdicts of guilty of crime A but not guilty of crime B, where both crimes arise out of the same set of facts, are legally inconsistent when they necessarily involve the conclusion that the same essential element or elements of each crime were found both to exist and not to exist. ***

***

Verdicts of guilty of crime A but not guilty of crime B, where both crimes arise out of the same set of facts, while not legally inconsistent because the two crimes have different essential elements (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840), may nevertheless be logically inconsistent. Verdicts are logically inconsistent when they can be construed to involve both the acceptance and the rejection of the same theory of the case for the State or the same theory of the defense. If they cannot be construed in any other way, then their logical inconsistency is a factor which contributes to the existence of a reasonable doubt as to the conviction, and that factor must be considered by a reviewing court in reviewing the defendant's contention on appeal that the evidence did not prove the defendant guilty beyond a reasonable doubt. Unless also legally inconsistent, however, logically inconsistent verdicts or findings do not *per se* require reversal (with or without a remand for a new trial on all counts) because, despite the logical inconsistency, the reviewing court may nevertheless find that there was adequate evidence for the State which, if believed, proved the defendant guilty beyond a reasonable doubt." *Murray*, 34 Ill. App. 3d at 531-32, 340 N.E.2d at 194.

See also *People v. Cobbins* (1987), 162 Ill. App. 3d 1010, 1023-25, 516 N.E.2d 382, 392-93; *People v. Rollins* (1985), 140 Ill. App. 3d 235, 242, 485 N.E.2d 1307, 1311-12.

■ Accordingly, logical inconsistency in verdicts, absent legal inconsistency, does not require reversal, as stated in *People v. Hairston* (1970), 46 Ill. 2d 348, 362, 263 N.E.2d 840, 849, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658, and *People v. Barnard* (1984), 104 Ill. 2d 218, 470 N.E.2d 1005. By contrast, in *People v. Spears* (1986), 112 Ill. 2d 396, 493 N.E.2d 1030, by returning verdicts for reckless conduct and attempt (murder), the jury necessarily found mutually inconsistent mental states to exist when defendant shot the victim. The *Spears* court found the resultant ver-

dicts legally, as well as logically, inconsistent, requiring reversal and remand for a new trial.

Subsequent to *Spears*, the appellate court districts have reiterated the rule of *Hairston* and *Barnard* that absent legal inconsistency, logical inconsistency in verdicts does not require reversal. See, for example, the decisions of the First District Appellate Court in *People v. Cobbins* (1987), 162 Ill. App. 3d 1010, 1025, 516 N.E.2d 382, 393 ("the jury's historic power of lenity prevails over traditional doctrine concerning [logically] inconsistent verdicts"), and *People v. Fiore* (1988), 169 Ill. App. 3d 601, 604, 523 N.E.2d 996, 997; of the Second District in *People v. Foley* (1987), 152 Ill. App. 3d 354, 357, 504 N.E.2d 254, 255-56, finding the verdicts could have been based on compromise or an exercise of lenity; and Third District in *People v. Robinson* (1986), 147 Ill. App. 3d 131, 133, 497 N.E.2d 862, 864 ("A jury may acquit a defendant on one or more counts in a multi-count indictment in the belief that the counts on which it convicted the defendant will provide sufficient punishment").

Nevertheless, as stated in *Murray*, reviewing courts will consider whether legally consistent verdicts are logically inconsistent and, if so, whether the logical inconsistency is such as to raise a reasonable doubt of the defendant's guilt. So, in *People v. Buford* (1982), 110 Ill. App. 3d 46, 55-56, 441 N.E.2d 1235, 1242-43, the defendant was convicted of rape and armed violence but acquitted of armed robbery and deviate sexual assault based on an attack upon the complainant. The defendant there, as here, contended the jury's verdicts were so logically inconsistent as to cast doubt upon the complainant's credibility, thus showing he could not have been found guilty of rape beyond a reasonable doubt. The *Buford* court rejected this argument, stating (1) the offenses with which the defendant was charged had dissimilar elements; (2) the verdicts could be construed as a finding by the jury that the State had proved the defendant forced the complainant to have vaginal intercourse at gunpoint but failed to prove either that he stole her money or that oral sex occurred; and (3) the verdict may have reflected the jury's belief that the convictions for rape and armed violence would provide sufficient punishment to the defendant, *i.e.*, an exercise of the jury's historic power of lenity.

Defendant argues the evidence against him cannot be found credible as to count I and not credible as to count II, contending the verdicts here suggest such a determination by the jury. In *People v. Garnett* (1969), 113 Ill. App. 2d 159, 166, 251 N.E.2d 761, 764, the court held verdicts of guilty of attempt (armed robbery) and not guilty of murder need not be treated as logically inconsistent since the jury

could have believed beyond a reasonable doubt that the defendant participated in the armed robbery attempt, but had reservations about his actually stabbing the deceased. See also *Cobbins*, 162 Ill. App. 3d at 1025, 516 N.E.2d at 393; *Buford*, 110 Ill. App. 3d at 55-56, 441 N.E.2d at 1242-43.

In the instant case, a review of the evidence suggests the jury could have believed beyond a reasonable doubt that the defendant committed the act of sexual penetration by the use of his finger, but had reservations about his commission of an act of sexual penetration by use of the tongue. First, while the complaining witness testified defendant would "lick" her, it was the "touching" aspect of the incidents which was primarily pursued in the questioning of this witness. Evidence pertaining to any sexual penetration of the complaining witness by the defendant by use of the tongue came primarily from the testimony of other witnesses about the victim's statements to them. Second, though we do not fault the jury instruction given (see Illinois Pattern Jury Instructions, Criminal, No. 11.65 (2d ed. Supp. 1987)), it is possible the jury misunderstood the sexual penetration issue by considering it in light of the common definition of insertion rather than the statutory definition, which refers to "any contact":

> " 'Sexual penetration' means any contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." Ill. Rev. Stat. 1985, ch. 38, par. 12—12(f).

 █ The credibility of the witnesses and the weight to be accorded their testimony is a matter within the province of the trier of fact and its determination is entitled to great weight. (*People v. Powell* (1985), 138 Ill. App. 3d 150, 156, 485 N.E.2d 560, 564; *People v. Server* (1986), 148 Ill. App. 3d 888, 894-95, 499 N.E.2d 1019, 1024, *cert. denied* (1987), 484 U.S. 842, 98 L. Ed. 2d 88, 108 S. Ct. 131.) A conviction for aggravated criminal sexual assault or abuse, when the defendant testifies and denies the charge, will be upheld when there is either some corroboration of the testimony of the prosecuting witness or that testimony is otherwise clear and convincing. (*Server*, 148 Ill. App. 3d at 894, 499 N.E.2d at 1024.) The testimony of the complaining witness need not be crystal clear and perfect in order for her testimony to be clear and convincing. (*Powell*, 138 Ill. App. 3d at 156, 485 N.E.2d at 564 (and cases cited therein).) We conclude the

verdicts in this case need not be construed as logically inconsistent, but even if deemed so, do not require reversal. The evidence is not so unsatisfactory or improbable that a reasonable doubt as to the defendant's guilt remains. *People v. Yates* (1983), 98 Ill. 2d 502, 518-19, 456 N.E.2d 1369, 1377-78, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364.

Defendant also argues that the elements of counts I and II here were identical as they charged the offense of aggravated criminal sexual assault. He contends the allegations differentiating the counts of sexual penetration, the reference to use of the finger in count I and use of the tongue in count II, are immaterial to the charge and mere surplusage. Defendant cites *People v. Winfield* (1987), 160 Ill. App. 3d 983, 990, 513 N.E.2d 1032, 1035, for this proposition. In *Winfield,* the trial judge specifically found the basis for the not guilty verdicts was the failure of the State to prove the element of penetration and found defendant guilty of the counts alleging "sexual conduct" (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(e)), but not guilty of the counts alleging "sexual penetration" (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(f)). Several of the "sexual conduct" counts contained allegations of "sexual intercourse" and "placing his penis on the sex organ," which were comparable to allegations in the "sexual penetration" counts of which defendant was acquitted. The defendant argued it was legally inconsistent to find him guilty of the "sexual conduct" counts but not guilty of counts alleging "sexual penetration." The *Winfield* court disagreed, finding the phrases "sexual intercourse" and "placing his penis on the sex organ," which were not statutorily defined, were not essential elements of the charged offenses since, if stricken, the remaining language still stated the requisite statutory elements. The *Winfield* court therefore referred to these terms as immaterial to the charge and mere surplusage.

We find *Winfield* inapposite to the issue before us. In this case, the finding of not guilty on the count charging defendant with sexual penetration by use of the tongue does not suggest the trier of fact implicitly found that the State did not prove beyond a reasonable doubt that defendant committed an act of sexual penetration by the use of his finger.

Defendant next argues the court erred in sustaining an objection to defense counsel's cross-examination of the examining physician regarding the rape trauma syndrome. The extent of cross-examination with respect to an appropriate subject of inquiry rests in the sound discretion of the trial court. Only in a case of clear abuse resulting in manifest prejudice to the defendant will a court of review interfere

with that determination. (*People v. Williams* (1977), 66 Ill. 2d 478, 487, 363 N.E.2d 801, 805.) As pointed out by the State, the prosecutor objected to this questioning on the basis of the matter being beyond the scope of direct examination. The trial court sustained the objection on that basis. The cross-examination was as follows:

"Q. [DEFENSE COUNSEL]: *** And in this particular case the strongest part for the formation of your opinion is that history, is it not?

A. [EXAMINING PHYSICIAN]: In this case, yes.

Q. Doctor, there are—let me start that question again. An occurrence such as described to you in the history that you took, would you describe that as a traumatic experience for the child?

A. Yes, I would.

Q. Are you familiar with either what is sometimes known as rape trauma syndrome or post traumatic stress syndrome?

[PROSECUTOR]: I am going to object to this line of questioning. It has been stipulated that the witness is a doctor, a medical doctor, qualified to base an opinion on physical examination. And I believe these questions aren't directed in that— regarding that stipulation.

THE COURT: He may answer.

* * *

Q. Are you familiar with either the phrase rape trauma syndrome or post traumatic stress syndrome?

A. I have heard those terms, yes.

Q. And are you familiar with some of the behavior that accompanies a person suffering from rape trauma syndrome or post traumatic stress syndrome from the result of a sexual occurrence?

[PROSECUTOR]: Your Honor, I am going to object. I just don't believe this is relevant going into this area. The witness didn't testify to any such trauma or anything other than what he did that night on the 24th and the 25th, conduct a physical examination and take a history. This type of question is beyond the scope of that.

THE COURT: Sustained.

Q. Before this was reported, in taking your history, was there anything indicated of any unusual behavior by [the victim]?

[PROSECUTOR]: Objection, your Honor.

THE COURT: He may answer.

A. There was nothing reported in the history that we obtained, no."

Defense counsel thereupon proceeded to question the doctor on matters which might have been discovered on an internal examination, which was not done here because of the absence of evidence of acute injury.

■ The general rule that cross-examination is limited to the subject matter inquired into on direct examination is modified to the extent that " '[i]t is proper on cross-examination to develop all circumstances within the knowledge of the witness which explain, qualify, discredit or destroy his direct testimony although they may incidentally constitute new matter which aids the cross-examiner's case.' " (*Williams*, 66 Ill. 2d at 486, 363 N.E.2d at 805, quoting S. Gard, Illinois Evidence Manual R. 471 (1963).) The scope of cross-examination as thus defined is not susceptible to determination with exactness; hence the standard of review. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §611.11, at 393 (4th ed. 1984).) From a review of the record, no abuse of discretion is demonstrated in sustaining the objection to questions on the rape trauma syndrome as beyond the scope of direct.

■ Moreover, defense counsel presented no further argument to dispute that this matter was beyond the scope of direct examination, nor an offer of proof outside the presence of the jury as to what he expected to elicit from the doctor and how it pertained to matters raised in direct examination. We recognize that in *People v. Kellas* (1979), 72 Ill. App. 3d 445, 454, 389 N.E.2d 1382, 1390, the court stated, "an offer of proof is not required when a witness is being cross-examined and the cross-examination is erroneously proscribed." When, however, an objection to cross-examination as beyond the scope of direct is sustained, or where the record does not show such cross-examination was erroneously proscribed, further argument by counsel and an offer of proof is necessary in order to show an abuse of discretion which amounts to reversible error. Upon the record before us, we find no abuse of discretion in the court's ruling.

The judgment of the circuit court of Macon County is affirmed.

Affirmed.

GREEN, P.J., and LUND, J., concur.